UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

THOMAS HANSEN,

                              **Plaintiff,**

    -against-

WWEBNET, INC., PAUL T. SWEENEY,
individually and in his capacity as an officer of
the corporation Wwebnet, Inc., ROBERT
KELLY, Inc., individually and in his capacity as
an officer of the corporation Wwebnet, Inc.,

                         **Defendants.**

            **1:14-cv-2263 (ALC)**

            <u>**OPINION & ORDER**</u>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7-31-15

---------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

## I.  INTRODUCTION

In this diversity action, defendant Paul Sweeney moves to dismiss the Second Amended
Complaint of plaintiff Thomas Hansen. Hansen alleges that Sweeney fraudulently induced him
to invest in the now-defunct corporation Wwebnet, a media content software developer.

Hansen's complaint lists fraud causes of action against both Sweeney and Wwebnet's
founder and director Robert Kelly. Against Sweeney, Hansen alleges misrepresentations and
failure to correct Kelly's misrepresentations related to Kelly's executive compensation and
Wwebnet's development and ownership of software and possession of revenue-bearing
contracts. For the reasons discussed below, Sweeney's motion to dismiss is granted in part and
denied in part.

## II.  BACKGROUND

### A.  Factual Background

From 2003 to 2008, non-moving defendant Robert Kelly attempted to develop and sell
software that media companies could use to directly market cinema, television, and music

content to consumers over the Internet. Second Amended Complaint ("SAC") ¶ 16-17. He did so as director and Chief Executive Officer of Wwebnet and its two predecessor companies, Direct Choice TV Communications Ltd. ("DCTV") and Dolny Limited. Id. ¶ 1. Plaintiff Thomas Hansen was Wwebnet's chief investor, making thirteen separate investments between March 2005 and November 2008, totaling approximately $5,944,846. Id. ¶¶ 6, 24.

In February 2004, before Hansen had made his first investment, Kelly gave him a document tiled "DirectChoice TV Communications, Ltd. Confidential Business Plan." Id. ¶ 53(a). That document stated that "DCTV customers include Atlantic Records, Warner Records, Universal Records, O2, TVT Records and a large number of independent music labels." Id. It also stated that "DCTV has deals with Warner UK" and that DCTV "recently received a Heads of Agreement from the music industry's largest label, Universal." Id. ¶ 53(c). In February 2005, Kelly gave Hansen a similar "Confidential Business Plan" that repeated the statement that "DCTV customers include Atlantic Records, Warner Records, Universal Records, O2, TVT Records and a large number of independent music labels." Id. ¶ 53(b). Additionally, at an unspecified point in time between 2005 and 2008, Kelly verbally represented to Hansen that Wwebnet possessed revenue-bearing contracts, specifically with Universal Music UK. Id. ¶ 22, 51.

Both the 2004 and 2005 business plans also touted Wwebnet's ownership of "unique technology" and its in-house technical team as reasons to invest. Id. ¶ 32. Nonetheless, Hansen refused to invest in Wwebnet without Kelly's direct assurance that the company's software would be internally developed and owned. Id. ¶ 27. Consequently, in early 2005, Kelly verbally represented to Hansen that Wwebnet investments would be used for the internal development of media marketing software that Wwebnet alone would own. Id. ¶¶ 19, 27-28.

In fact, Wwebnet did not possess a revenue-bearing contract with Universal Music UK or other media content producers, at any time. Id. ¶ 2. Nor was the media marketing software being developed internally by Wwebnet. Id.  ¶ 25. Instead development was outsourced to Rymatics, Inc., a corporation that predated Wwebnet's creation and was majority owned by Kelly. Id. In 2005, Kelly had executed a five-year contract between Wwebnet and Rymatics so that the latter could develop software for the former. Id. ¶ 36. Hansen alleges only that the contract was for development; his complaint is silent as to which corporation actually owned the software. Regardless, under the contract Rymatics earned "approximately $2.85 million from March 2005 to September 2007." Id. ¶ 38. But at least $666,000 of the Rymatics payments were used by Kelly himself for personal expenses. Id. ¶¶ 41-42.

In December 2006, moving defendant Robert Sweeney joined Wwebnet as its Chief Financial Officer. Id. ¶ 55. In his position, he had access to and knowledge of Wwebnet's financial transactions, including accounts receivable, accounts payable, executive and officer compensation, and payments to vendors. Id. ¶ 44. At an unspecified point in 2007, Kelly and Sweeney jointly gave Hansen a document titled "Wwebnet, Inc. Content Acquisition Model." Id. ¶ 53(f). That document listed a series of contracts described as "pending," as well as expected revenues from each one. Id. ¶ 53(f). One of the contracts listed, with Universal Music UK, also bore a notation that stated "Existing Contract" with a minimum guarantee of $3,000,000. Id. ¶ 53(f).

In June 2007, Sweeney traveled to London to meet with employees of Universal Music UK. Id. ¶ 57. In July 2007, Sweeney sent an email to Kelly and two other Wwebnet employees stating, "I met the following person from Universal UK at a dinner party. I gave him our pitch.

You may want to follow up with him. He seemed very interested in what we are doing, although he did not seem familiar with us . . . ." Id. ¶ 59-60.

In August 2007, Kelly and Sweeney jointly gave Hansen a document stating that approximately $8.5 million of Wwebnet capital was spent on "the development of broadcast software," amongst other expenses. Id. ¶ 35. Also in August 2007, Kelly and Sweeney jointly gave Hansen a document stating that "'Revenues started with the commencement of the [major entertainment company] announcement'" (so bracketed in the Second Amended Complaint), that a customer of Wwebnet "'use[s] the Company's software platform to sell direct to consumer," and that Wwebnet had sold "over £100,000 of advertising per month." Id. ¶ 53(e).

In the more than three years that he invested in Wwebnet, Hansen met approximately weekly with either Kelly alone or Sweeney and Kelly together at Wwebnet's offices in New York. ¶ Id. 29. The purpose of the meetings was to discuss company business, specifically Wwebnet's internal development of software and revenue-generating contracts. Id. ¶¶ 29, 51. Neither Kelly nor Sweeney ever disclosed to Hansen that Wwebnet's marketing software was developed by Rymatics pursuant to a multi-million dollar contract, or that Rymatics money was used for Kelly's personal expenses. Id. ¶ 30. Neither Kelly nor Sweeney ever disclosed to Hansen that Wwebnet did not have a revenue-generating contract with Universal Music UK. Id. ¶ 51. On several of these visits, Hansen directly asked Sweeney, "How was everything going with wwebnet [sic] and with Universal Music?" Id. ¶ 63.

"Good," Sweeney responded. Id.

"Are we making any money on the Universal Music contract?" Hansen specified. Id. ¶ 64.

"Yes!" Sweeney responded. Id.

Sweeney resigned from Wwebnet in September 2008.[1] Upon resignation, he received a $50,000 bonus and $400,000 worth of Wwebnet common stock. Id. ¶¶ 67-68. Approximately one month after resigning, Sweeney told investor and Wwebnet employee Walter Walsh to "run, just don't walk away from Wwebnet! And if it looks bad, smells bad, it is bad!" ¶ Id. 69. On March 11, 2014, Kelly pleaded guilty to wire fraud and securities fraud in the Southern District of New York in connection with his scheme to defraud Wwebnet investors. Id. ¶ 48.

Hansen alleges that Sweeney fraudulently induced all thirteen of his investments by either misrepresenting or failing to correct Kelly's misrepresentations. The thirteen investments and the dates he made them are as follows:

---

[1]   The SAC gives two conflicting dates for Sweeney's departure: February 2008, SAC ¶ 11, and September 2008, id. ¶¶ 1, 44, 66. Hansen's original complaint repeatedly placed Sweeney's departure date in January 2008. Notice of Removal, ECF No. 2, Ex. A, ¶ 14, 20. Hansen also provided an affidavit in a prior state court action attesting to January 2008 as the departure date. Silverman Decl., ECF No. 29, Ex. B, ¶ 10. But Hansen's motion papers repeatedly identify September 2008 as Sweeney's date of departure.

"[T]he Court is not required to accept as true pleadings that are directly contradicted by other factual statements in the . . . Complaint," Barberan v. Nationpoint, 706 F. Supp. 2d 408, 424 (S.D.N.Y. 2010). Further "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular . . . matters of which a court may take judicial notice." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). But when courts "take judicial notice of documents filed in other courts, [it is] not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Kramer v. Time Warner Inc., 937 F.2d 767, 774 (2d Cir. 1991).

It is self-evident that Sweeney could not have resigned from Wwebnet in both February and September, so these statements in the SAC directly contradict each other and the Court needn't accept either as true. Although the bulk of evidence from Hansen's earlier complaint and affidavit in the state court action support a finding that Sweeney's departure occurred in early 2008, such evidence is not properly before the Court on a motion to dismiss. Firstly, the SAC replaces the factual allegations of the original complaint. Secondly, the Court is not permitted to take judicial notice of the truth of Hansen's assertion via affidavit in the previous state court action that Sweeney actually retired in January 2008. Finally, Hansen's repeated reliance in his motion papers on September 2008 as the date of Sweeney's departure makes it likely that the SAC's singular mention of February 2008 was in error. Accordingly, for the purposes of the motion to dismiss, the Court concludes that September 2008 was Sweeney's departure date. The Court reserves judgment on the issue in the context of any future motions, where other sources of evidence may properly be considered.

    a.  March 22, 2005: $350,000
    b.  August 30, 2005: $125,000
    c.  June 26, 2006: $200,000
    d.  February 7, 2007: $2,000,000
    e.  August 29, 2007: $1,359,846
    f.  March 5, 2008: $500,000
    g.  May 2, 2008: $500,000
    h.  June 5, 2008: $100,000
    i.  July 1, 2008: $150,000
    j.  August 5, 2008: $180,000
    k.  August 27, 2008: $180,000
    l.  October 1, 2008: $150,000
    m.  November 4, 2008: $150,000

Id. ¶ 24.

The Court takes judicial notice of a state court lawsuit filed in Nassau County, New York on December 31, 2010 by Wwebnet shareholders Walter Walsh and Frank Moscati against Kelly, Sweeney, and other Wwebnet employees ("Nassau County suit"). In that "shareholders' derivative action . . . the plaintiffs allege[d] that the board of directors of Wwebnet, Inc. . . . diverted corporate assets for their personal gain or colluded in the diversion of assets by others." Walsh v. Wwebnet, Inc., 116 A.D.3d 845, 845 (2d Dep't. 2014). Sweeney moved for dismissal, but the trial court denied his motion and granted plaintiffs the opportunity to amend their pleadings. The Second Department reversed that grant, "[b]ecause the plaintiffs' proposed amendments to their derivative causes of action for damages were palpably insufficient, [and] they should not have been permitted." Id. at 846. The derivative action against Sweeney was therefore dismissed.

## III. DISCUSSION

### A. Legal Standard

To survive a motion to dismiss under Fed.R.Civ.P. 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550

U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content
that allows the Court to draw the reasonable inference that the defendant is liable for the
misconduct alleged." Iqbal, 556 U.S. at 678.

On a motion to dismiss, the court accepts the plaintiff's allegations as true. Kassner v.
2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir.2007). Further, the court must "draw all
reasonable inferences in favor of the plaintiff." Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51
(2d Cir.2006)). However, the court need not accept allegations that are merely conclusions of
law. Iqbal, 566 U.S. at 678 (a complaint is inadequate if it merely "offers labels and conclusions
or a formulaic recitation of the elements of a cause of action") (internal quotations omitted).
Ultimately, on a motion to dismiss "[t]he appropriate inquiry is not whether a plaintiff is likely to
prevail, but whether he is entitled to offer evidence to support his claims." Fernandez, 471 F.3d
at 51 (internal quotation marks and citation omitted).

### B. Analysis

Sweeney styles all of Hansen's claims in the current suit as derivative causes brought on
behalf of Wwebnet. As such, he seeks to bar them under the doctrine of claim preclusion,
because they were already litigated in the Nassau County suit.[2] Under claim preclusion, "a final
judgment on the merits of an action precludes the parties or their privies from relitigating issues

---

[2] Sweeney uses the term "res judicata" to discuss the preclusive effect of the Nassau County suit, while
Hansen variably refers to Sweeney's argument as one of "res judicata" or "issue preclusion." In Taylor v.
Sturgell, 553 U.S. 880 (2008), the Supreme Court explained that res judicata collectively refers to the
distinct doctrines of claim preclusion and issue preclusion. The former bars successive litigation of the
same claim, while the latter bars successive litigation of an issue of law or fact "actually litigated and
resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the
context of a different claim." Id. at 892. Here, the parties dispute whether Sweeney's entire claims were
already litigated in the Nassau County suit, rather than particular issues of law or fact. Therefore, in the
interests of exactitude, the Court employs the term claim preclusion when discussing the parties'
arguments.

that were or could have been raised in that action." TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 499 (2d Cir. 2014). Hansen forthrightly concedes that the Nassau County suit precludes him and any other Wwebnet shareholder from bringing derivative claims against Sweeney for harm to Wwebnet. But he contends that he has in fact pleaded direct claims against Sweeney for harm to Hansen personally. Accordingly the Court must decide whether Hansen's claims are derivative or direct.

　　　　*1. Hansen's claims are direct.*

　　Both parties' briefs rely on New York law in support of their arguments "and such implied consent . . . is sufficient to establish choice of law." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000) (internal quotations omitted). Accordingly, this Court will apply New York law to the matter at hand.

　　Under New York law, "a derivative claim seeks to recover for injury to the business entity," while "a direct claim seeks redress for injury to [a plaintiff] individually." Yudell v. Gilbert, 99 A.D.3d 108, 113 (1st Dep't. 2012). In Yudell, the First Department adopted Delaware's "common sense approach" for deciding whether a claim is derivative or direct. Id. at 113 (citing Tooley v Donaldson, Lufkin & Jenrette, Inc., 845 A2d 1031, 1039 (Del. 2004)). Under Tooley, "a court should consider (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)." Yudell, 99 A.D.3d at 114 (internal quotations omitted). Thus, a plaintiff alleges "a classic derivative claim" where he alleges "that the corporation was harmed because its assets were diverted, thereby harming the corporation's shareholders." Halebian v. Berv, 590 F.3d 195, 207-08 (2d Cir. 2009). In contrast, where "the acts that allegedly harmed the shareholders *increased* the [corporation's] assets . . . it would

appear that the alleged injuries were to the shareholders alone and not to the [corporation,]" thus making the claims direct. Strougo v. Bassini, 282 F.3d 162, 175 (2d. Cir 2002) (emphasis in original).

Hansen alleges that Sweeney fraudulently induced his investment in Wwebnet by misrepresenting or failing to correct misrepresentations of three sets of facts: (1) the amount of executive compensation paid to Kelly; (2) Wwebnet's lack of internally developed and owned software, and (3) Wwebnet's lack of revenue-generating contracts. Hansen's claims are direct under under Yudell because they assert harms to him personally. See also Cerebelli v. Elghanayan, 990 F.2d 62, 64 (2d. Cir. 1993); Solutia Inc. v. FMC Corp., 385 F. Supp. 2d 324, 332-33 (S.D.N.Y. 2005) (finding direct causes of action where plaintiffs were fraudulently induced to invest). Hansen claims not that Sweeney's fraud decreased the value of his investment, but rather that he would never have invested in the first place but for that fraud. Thus, the alleged fraud did not harm Wwebnet. Indeed, the misrepresentations and omissions here "might be seen as benefitting the corporation in the sense that they . . . increase[d] its assets." Strougo, 282 F.3d at 172. Further, as Hansen points out, even if Kelly had never stolen a dime from Wwebnet, Hansen's investments would still have been fraudulently induced. Thus if Hansen were successful at trial under this theory, recovery would flow directly to him rather than to Wwebnet.

Sweeney believes that to be liable for fraudulent inducement, he must have been a party to and benefitted from the induced transaction. See M Entm't, Inc. v. Leydier, 71 A.D.3d 517, 519 (1st Dep't. 2010) (upholding a trial court's summary judgment in favor of two defendants who "were not parties to" the agreements at issue, "nor did they receive any money in connection with the subject transaction"). In this case, Sweeney was not the counterparty to

Hansen's investments; Wwebnet was. Further, it was Wwebnet, not Sweeney, that received Hansen's money. But New York has long held that if a party has committed fraud against another, he remains "liable, though he may not have profited from [the fraud] or had any interest in the deception. . . ." Laska v. Harris, 215 N.Y. 554, 557 (1915); Sisler v. Sec. Pac. Bus. Credit, Inc., 201 A.D.2d 216, 222 (1st Dep't. 1994) ("If appellant made the representation and warranty of authority with a fraudulent design, as alleged, and damage resulted, he is liable, notwithstanding his lack of personal interest in the transaction and even though the misrepresentations were made on behalf of the trust."); Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc., 88 A.D.2d 461 n.5 (2d Dep't. 1982) (company president was personally liable for fraud, "even though the misrepresentation occurred on behalf of his principal, and even though he did not have a personal interest in the transaction"). Under New York law, it is therefore irrelevant whether Sweeney personally benefitted from Hansen's investments. Instead, the sole relevant question is whether Sweeney's fraud induced Hansen to invest in Wwebnet.

Accordingly, Hansen's claims of fraudulent inducement of his investments are direct. They therefore are not precluded by the Nassau County suit.

### 2. Hansen's claims are partially barred by the statute of limitations.

Even if Hansen's claims are direct, several of them are nonetheless barred under New York's statute of limitations for a fraud action. "A fraud cause of action must be interposed within the greater of six years from the date the cause of action accrued, i.e., when the plaintiff was damaged by the alleged misconduct, or two years from the time the plaintiff discovered, or with reasonable diligence could have discovered, the fraud." House of Spices (India), Inc. v. SMJ Servs., Inc., 103 A.D.3d 848, 849 (2d Dep't. 2013); N.Y. C.P.L.R. 213(8). See also Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 748 (2d Cir. 1979) (stating that the

cause of action accrues when the party alleging fraud suffers damages). New York law holds that "the time a plaintiff could with reasonable diligence have discovered the alleged fraud is the time from which it conclusively appears that the plaintiff has knowledge of facts which should have caused [him or] her to inquire and discover the alleged fraud." Baratta v. ABF Real Estate Co., 215 A.D.2d 518, 519 (2d Dep't. 1995) (internal quotations omitted). "The burden of establishing that the fraud could not have been discovered during the two-year period before the commencement of the action rests on the plaintiff, who seeks the benefit of the discovery exception to the six-year statute of limitations." Percoco v. Lesnak, 24 A.D.3d 427, 427-28 (2d Dep't. 2005).

          *i. The statute of limitations is not tolled for fraudulent concealment.*

       Hansen urges the Court to toll the statute of limitations based on fraudulent concealment. "Fraudulent concealment is a doctrine of equitable estoppel that comes into play if the defendant takes active steps to prevent the plaintiff from suing in time, as by promising not to plead the statute of limitations." S.E.C. v. Wyly, 788 F. Supp. 2d 92, 103 (S.D.N.Y. 2011), on reconsideration in part, 950 F. Supp. 2d 547 (S.D.N.Y. 2013). The New York Court of Appeals has observed that "[f]raudulent representations may play a dual role. They may be the basis for an independent action for fraud. They may also, in equity, be a basis for an equitable estoppel barring the defendants from invoking the statute of limitations as against a cause of action for breach of fiduciary relations." Simcuski v. Saeli, 44 N.Y.2d 442, 448 (1978). That being said, "where the alleged concealment consisted of nothing but defendants' failure to disclose the wrongs they had committed, we have held that the defendants were not estopped from pleading a statute of limitations defense." Corsello v. Verizon New York, Inc., 18 N.Y.3d 777, 789 (2012).

The essence of Hansen's claim is that because Sweeney's material omissions prevented him from becoming aware of the fraud, the statute of limitations on those claims should be tolled. Hansen has "not alleged an act of deception, separate from the ones for which [he] sue[s], on which an equitable estoppel could be based." Id. Accordingly, the statute of limitations on Hansen's claims is not tolled by fraudulent concealment.

      *ii.   Fraud claims on investments made prior to December 24, 2007 are barred by the statute of limitations.*

Hansen filed this action on December 24, 2013. Sweeney argues that any fraud cause of action is time-barred because all of the alleged misrepresentations occurred prior to December 24, 2007, six years before the filing date. However, the relevant law states that accrual on the statute of limitations begins at the time of damages to the plaintiff rather than misrepresentation or omission by the defendant. Damages for investments (a) through (e), totaling $4,034,846, occurred between March 22, 2005 and August 29, 2007. SAC ¶ 24(a)-(e). Therefore, these claims are time-barred by the six-year statute of limitations.

Nor has Hansen asserted a timely action for investments made prior to December 24, 2007 on the basis that he did not discover or reasonably could not have discovered the underlying fraud before December 24, 2011, or within two years of filing. Hansen argues that because he continued to invest until November of 2008, he had certainly not discovered the fraud before that date. But even accepting that as true, Hansen has not alleged any facts as to when he did discover the fraud, let alone whether that discovery occurred within two years prior to filing his action. Accordingly, Hansen has not met his burden to justify applying the discovery exception to the six-year statute of limitations and claims on investments (a) through (e) are dismissed as time-barred.

      *iii.   Fraud claims on investments made after December 24, 2007 are not*

*barred by the statute of limitations.*

Hanson's remaining claims survive the statute of limitations. Sweeney argues that any investments made subsequent to his departure from Wwebnet are not recoverable. But Hansen could have continued to rely on Sweeney's alleged misrepresentations when making investments, even after Sweeney's resignation. Because investments (f) through (m), totaling $1,910,000, were made both after Sweeney's first alleged misrepresentation to Hansen at some point in 2007 and after the commencement of the six-year period for the statute of limitations that started on December 24, 2007, they are not time-barred.

    3.   *Hansen adequately alleges fraud by misrepresentation only in regards to certain documents and conversations.*

Of Hansen's timely, direct claims, only some adequately plead Sweeney's fraud. In New York a plaintiff pleading fraud must allege "that the defendant knowingly or recklessly misrepresented a material fact, intending to induce the plaintiff's reliance, and that the plaintiff relied on the misrepresentation and suffered damages as a result." <u>Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.</u>, 500 F.3d 171, 181 (2d Cir. 2007) (citing <u>Jo Ann Homes at Bellmore, Inc. v. Dworetz</u>, 25 N.Y.2d 112, 119 (1969)). Rule 9(b) of the Federal Rules of Civil Procedure also requires "particularity" from a fraud pleading, such that the plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." <u>Rombach v. Chang</u>, 355 F.3d 164, 170 (2d Cir. 2004). "The primary purpose of Rule 9(b) is to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." <u>Ross v. Bolton</u>, 904 F.2d 819, 823 (2d Cir. 1990).

"[A]lthough Rule 9(b) permits knowledge to be averred generally, [courts] have repeatedly required plaintiffs to plead the factual basis which gives rise to a strong inference of

fraudulent intent." O'Brien v. Nat'l Prop. Analysts Partners, 936 F.2d 674, 676 (2d Cir. 1991)
(internal quotations omitted). A strong inference "may be established either (a) by alleging facts
to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging
facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."
Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91 (2d Cir. 2006). Strong circumstantial evidence
includes a showing that defendants (1) "benefitted in a concrete and personal way from the
purported fraud"; (2) "engaged in deliberately illegal behavior"; (3) "knew facts or had access to
information suggesting that their public statements were not accurate"; or (4) "failed to check
information they had a duty to monitor." ECA, Local 134 IBEW Joint Pension Trust of Chicago
v. JP Morgan Chase Co., 553 F.3d 187, 199 (2d Cir. 2009).

> i. *Hansen fails to adequately allege that Sweeney made misrepresentations*
> *regarding Wwebnet's ownership and internal development of software.*

Hansen alleges in two paragraphs of the SAC that documents that Sweeney provided him
contained affirmative misrepresentations about Wwebnet's internal development and ownership
of software, which in reality was developed by Rymatics. The first paragraph references an
August 2007 document that states that approximately $8.5 million of Wwebnet capital was spent
on "the development of broadcast software," amongst other expenses. SAC ¶ 35. The second
paragraph references a document provided to Hansen in August 2007 that states that a Wwebnet
customer "use[s] the Company's [ie. Wwebnet's] software platform to sell direct to consumer."
Id. ¶ 53(e). It is unclear whether both statements are contained in the same document.
Regardless, the first paragraph does not support an allegation of misrepresentation because on its
face it speaks only of development, making no representation at all as to whether it occurred
internally or externally. Even accepting that the software was in actuality externally developed,

Hansen fails to identify any affirmative statement of Sweeney's to the contrary. Accordingly, no fraud claim lies in relation to the August 2007 document described in paragraph 35 of the SAC.

The second statement alleged to be fraudulent also falls short of an adequate pleading. The alleged misrepresentation of the software ownership rights rests on a literal sliver: the apostrophe in the phrase "the Company's software." One could reasonably conclude that this statement does not even make a representation of ownership by Wwebnet. But even if it did, Hansen's pleading of Sweeney's misrepresentation regarding software ownership suffers from a fundamental inadequacy: nowhere in his complaint does Hansen allege that the software at issue was not, in fact, owned by Wwebnet. Instead, Hansen's complaint speaks only of Wwebnet's contract with Rymatics "to develop" software. Id. ¶¶ 20-21, 29, 31, 33, 35-37, 46-47, 72-73, 75-77, 79, 84-85, 89-90, 92-95, 96. But a development contract alone does not grant ownership rights. And because Hansen has not alleged that the contract with Rymatics did so, this Court will not assume that it did. Accordingly, Hansen fails to state a claim that Sweeney affirmatively misrepresented Wwebnet's ownership of the software and no fraud claims lies in relation to the statement alleged at paragraph 53(e).

In sum, the Court concludes that Hansen has not adequately alleged fraud by misrepresentation in regards to Wwebnet's ownership and internal development of software.

>    ii.   *Hansen adequately alleges that Sweeney made misrepresentations*
>          *regarding Wwebnet's possession of revenue-generating contracts.*

Hansen's other allegations of affirmative fraud concern two specific statements regarding Wwebnet's ownership of revenue-generating contracts. The first allegedly occurred in a 2007 document that lists a contract with Universal Music as an existing contract with a minimum guarantee revenue of $3 million. The second allegedly occurred in multiple conversations

between Hansen and Sweeney that took place shortly after June 2007. The Court analyzes both in turn and concludes that both are adequately alleged.

>    1.   *The claim concerning a 2007 document adequately alleges fraud.*

Hansen alleges that a 2007 document provided to him by Kelly and Sweeney contained a representation that an existing contract with Universal Music guaranteed $3 million in revenue. SAC ¶¶ 103(f)-104. He further alleges that Sweeney, as CFO, knew that Wwebnet had no revenue-generating contracts, id. ¶ 118; that he acted with intent to defraud Hansen, id. ¶ 119; that Wwebnet's "generation of revenue from customer contracts was important information for Plaintiff Hansen when making his investment decisions," id. ¶ 54; that Hansen justifiably relied on Sweeney's false statements about the contract when purchasing Wwebnet shares, id. ¶ 123; and that he was damaged to no less than his full investment in Wwebnet, id. ¶ 125.

Sweeney reasons that even if Hansen alleged the elements of fraud, as a matter of law his reliance on Sweeney's misrepresentations was not justifiable because Hansen was a sophisticated investor of millions of dollars with ready access to the information he claims was misrepresented, specifically the email sent to Wwebnet employees from Sweeney after the London trip asking them to follow up with Universal. See Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 101 (2d Cir. 1997) ("Generally, sophisticated businessmen's reliance on the misrepresentations of a party is *un*reasonable when the businessmen are 'engaged in major transactions [with] access to critical information [and] fail to take advantage of that access.'"(citing Grumman Allied Indus. v. Rohr Indus., Inc., 748 F.2d 729, 737 (2d Cir.1984)). In Warhol, a licensing dispute, the sophisticated plaintiff was a "very successful" licensing company buttressed by a team of copyright specialist lawyers. Warhol at 93. In Grumman, a

plaintiff corporation came "[a]rmed with an arsenal of seasoned negotiators, sophisticated

engineers, experienced executives and capable attorneys and accountants." Grumman at 730.

It cannot be said as a matter of law that Hansen, acting alone, was a sophisticated

businessman merely because he invested hefty sums, as Sweeney takes for granted. Indeed,

Hansen's major losses arguably indicate that he was not sophisticated. Moreover, it is unclear

how Hansen had ready access to the information Sweeney claims he did. Hansen's only access to

Wwebnet's confidential business plans came from documents directly provided to him by

Sweeney and Kelly. His visits to Wwebnet's offices occurred only while Sweeney and Kelly

were present. And Sweeney's email was sent only to employees and investor-employees of

Wwebnet. Accordingly, Hansen has alleged justifiable reliance on Sweeney's statements.

Whether Hansen complied with 9(b) particularity regarding the 2007 document is a closer

call. Although Sweeney argues that Hansen did not specify who provided him with the 2007

document, the complaint clearly alleges that both Sweeney and Kelly provided the document. Id.

¶ 53(f). The more serious attack against Hansen's claim is the lack of specifying date in which

the document was provided. Hansen alleges only that Sweeney provided the document to him at

some point in 2007. Courts in this circuit have issued conflicting rulings on the time period

within which a statement can be alleged and still be found to satisfy particularity. Compare

Sequa Corp. v. Bailey, 1989 WL 60036, at *3 (S.D.N.Y. June 1, 1989) (finding that three months

was too broad a period to satisfy particularity) with Jubran v. Musikahn Corp., 673 F. Supp. 108,

112 (E.D.N.Y. 1987) (finding particularity for a statement alleged somewhere within a three-

and-a-half month period). However, in keeping with the purpose of Rule 9(b), courts are willing

to tolerate greater ambiguity in a specified time period when, as a whole, other allegations about

a fraudulent statement provide a party with sufficient notice to prepare its defense. See

Mayatextil, S.A. v. Liztex U.S.A., Inc., 1993 WL 51094, at *2 (S.D.N.Y. Feb. 24, 1993) (a 14-month period is particular where complementary "factual allegations are sufficiently detailed to provide defendants with the opportunity to answer"); Jubran, 673 F. Supp. at 112 (a three-and-a-half month period is particular where "plaintiffs have alleged sufficient additional facts to enable [defendant] to prepare a defense and refute plaintiffs' allegations"); cf. In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 2008 WL 2594819, at *10 (S.D.N.Y. June 26, 2008) (a one-year period is insufficiently particular where the "complaint fails to identify: a single specific false statement; a single research report that contained allegedly false statements; the author(s) of the false statements; why the (unspecified) statements were in fact false when made").

Here, although the time period of one year is considerable, Hansen has identified the speakers charged and the exact statement alleged to be fraudulent. Further, he has provided enough identifying detail about the document, including its title, such that Sweeney may adequately prepare a defense to the allegation. The complaint thus gives Sweeney "notice of precisely what he is charged with. No more is required by Rule 9(b)." Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985).

Hansen also establishes a strong inference of fraudulent intent based on "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness," Lerner v. Fleet Bank, N.A., 459 F.3d 273, 290-91, specifically Sweeney's "access to information suggesting that [his] public statements were not accurate." ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 199. Sweeney argues that if the statement happened before his June 2007 London trip to meet with a Universal Music representative who "did not seem familiar with us," then it was consistent with an honest belief

that the contract did exist. But if the statement occurred after the trip, a reasonable inference can be drawn that Sweeney had confirmation that no contract with Universal existed.

Separately, and even if the statement occurred before the London trip, Sweeney's position as Wwebnet's CFO makes it plausible that he knew from at least December 2006 whether Wwebnet had a revenue-generating contract with Universal. See In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 75-76 (2d Cir. 2001) (finding adequate an allegation where the defendant "was vice president for finance and investor relations and therefore in a position . . . to access confidential information"); Goldman v. Belden, 754 F.2d 1059, 1070 (2d Cir. 1985) (finding a factual basis for attributing knowledge to defendants based on their "self-portrayals as industry-wise businessmen"). Because the statement at issue here occurred at some point in 2007, after Sweeney's appointment as CFO, Hansen has alleged strong circumstantial evidence of conscious misbehavior or recklessness.

> 2.  *The claim concerning Universal Music conversations after June 2007 adequately alleges fraud.*

Hansen also alleges that shortly after Sweeney's June 2007 London trip, the pair had multiple conversations in which Sweeney directly represented to him that Wwebnet's relationship with Universal Music UK was "good" and that the two parties had a contract that was making money for Wwebnet. Id. ¶ 63-64. Hansen alleges the elements of fraud in relation to these conversations by stating that Sweeney "falsely stat[ed] that Wwebnet had contracts with media-content producers that were generating revenue," id. ¶ 120; that Sweeney knew of the falsity of those statements through his position as CFO and his meeting with Universal on the London trip, id. ¶ 118-19; that Sweeney "acted with intent to defraud and deceive," id. ¶ 120; that such falsehoods were material to his decision to invest, id. ¶ 122; that he justifiably relied on them, id. ¶ 123; and that he was damaged no less than his full investment in Wwebnet, id. ¶ 125.

Hansen also states a sufficiently particular claim under Rule 9(b). Sweeney's affirmation that Wwebnet was making money from a Universal contract was the specifically fraudulent statement because Wwebnet had no Universal contract. Hansen further identified the time and place of the statement by alleging that he "would visit the Company's offices approximately once per week from 2005 to 2008" to discuss company business, id. ¶ 62, and that "on several of these visits, shortly after . . . Sweeney's trip to London," the alleged conversations took place. A generous reading of the complaint places the alleged conversations "shortly after" June 2007. Although the Court has some doubts as to the plausibility of Hansen's allegations of several conversations that happened on a weekly basis and all repeated the same two questions and monosyllabic answers, it cannot be said that the identical conversations are implausible. Finally, as before, a strong inference of fraudulent intent exists because of Sweeney's access to Wwebnet's financial data and his confirmation via the London trip that no contrast existed with Universal Music UK.

In sum, the Court concludes that Hansen has adequately alleged fraud by misrepresentations of Wwebnet's possession of revenue-generating contracts made in a 2007 document and several identical conversations occurring shortly after June 2007.

> *4.   Hansen adequately alleges fraud by omission due to Sweeney's failure to correct Kelly's misrepresentation.*

Hansen also successfully pleads fraud by Sweeney's failure to correct Kelly's misrepresentation, though only in relation to one document. In order to state a claim for failure to correct, Hansen must allege not only the elements of fraud, but also "the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff." High Tides, LLC v. DeMichele, 88 A.D.3d 954, 959 (2d Dep't. 2011). In New York, such a relationship arises "where one party possesses superior knowledge, not readily available

to the other, and knows that the other is acting on the basis of mistaken knowledge." TVT Records v. Island Def Jam Music Grp., 412 F.3d 82, 91 (2d Cir. 2005) (internal citations and quotations omitted); see also Banque Arabe et Internationale D'Investissement v. Maryland Nat. Bank, 57 F.3d 146, 155 (2d Cir. 1995) (concluding that no duty based in superior knowledge existed where plaintiff failed to allege that defendant knew of plaintiff's reliance on mistaken knowledge).

The Court concludes that Hansen has adequately alleged fraud by omission in relation to the 2007 document titled "Wwebnet, Inc. Content Acquisition Model."

*i.   Sweeney had a duty to disclose based on superior knowledge.*

Hansen's complaint alleges that Sweeney had a "fiduciary duty to disclose to shareholders material facts and correct misrepresentations." SAC ¶ 83. His brief hedges his bets by arguing that the duty was not fiduciary based on the type of relationship between the parties, but instead based on Sweeney's superior knowledge of Wwebnet's finances. The two duties are not mutually exclusive. In fact, "New York law does recognize that a fiduciary duty may arise out of 'a relationship of confidence, trust, or superior knowledge or control.'" Solutia Inc. v. FMC Corp., 456 F. Supp. 2d 429, 456 (S.D.N.Y. 2006) (citing Broadway Nat'l Bank v. Barton–Russell Corp., 154 Misc.2d 181, 585 N.Y.S.2d 933, 945 (Sup.Ct.1992)); see also Brass v. Am. Film Technologies, Inc., 987 F.2d 142, 152 (2d Cir. 1993) (a business had a duty to disclose to an investor that stocks issued were not freely tradable); cf. Cerebelli v. Elghanayan, 990 F.2d 62, 64 (2d. Cir. 1993) (finding that a stock vender had a duty to a shareholder based on superior knowledge, even absent a fiduciary relationship).

A fiduciary duty based in superior knowledge is properly alleged here. Hansen alleges that Sweeney's superior knowledge came from his access to Wwebnet's financial data as its

CFO. In addition, Sweeney's conversation with the Universal Media contact during a business trip to London reasonably suggests an alternative means of knowledge of fraud regarding the Universal contract, at least. Sweeney's private conversation with investor Walter Walsh approximately one month after resigning, in which he advised Walsh to "run-just don't walk away from Wwebnet!", further indicates that he had superior knowledge of Wwebnet's fraudulent business practices. None of this information was readily available to Hansen, because, as explained above, his only access to Wwebnet financial data and business practices came directly from Sweeney and Kelly themselves. Finally, by alleging that Sweeny acted with intent to deceive and defraud by failing to correct Kelly's misrepresentations, Hansen necessarily alleges that Sweeney knew that Hansen was investing on the basis of mistaken knowledge.

Sweeney's final argument against the superior knowledge-based duty to Hansen is that it is preempted by federal securities laws that prohibit selective disclosure of insider information. He cites to Chanoff v. U.S. Surgical Corp., 857 F. Supp. 1011, 1016 (D. Conn. 1994), aff'd, 31 F.3d 66 (2d Cir. 1994), cert. denied, 513 U.S. 1058, (1994), in support of his argument. The Chanoff court considered whether the plaintiff's "state claims for fraud, negligence and breach of fiduciary duty are preempted by the federal securities laws to the extent that the state claims are premised on the defendants' alleged duty to disclose inside information" to the plaintiff. Concluding that Congress did not so occupy the field of securities regulation as to impliedly preempt state law causes of action, the court looked for actual conflict between federal securities laws and the plaintiff's claim that the defendants owed him specifically a duty to disclose inside information that would have stopped him from selling or hedging his stocks. The court concluded that selective disclosure to the defendant alone would have exposed both parties to liability under federal law prohibiting insider tipping, causing an actual conflict between state

and federal law, and thus preempting the plaintiff's state law claims. But the court qualified its holding by stating that "[i]nsofar as the claims are premised on the defendants' duty to disclose to the public and shareholders generally, such claims may be entirely consistent with the federal securities regulatory scheme." Id.

Chanoff is inapposite here because Hansen does not argue that Sweeney's duty to correct was to him exclusively, but rather to all investors to whom Kelly made misrepresentations regarding Wwebnet's software and revenue-generating contracts. Indeed, in support of his argument that Sweeney's duty is potentially applicable to a wide class of Wwebnet investors, Hansen cites to Eisenberg v. Flying Tiger Line, Inc., 451 F.2d 267 (2d. Cir. 1971), which reinstated a class action on behalf of multiple investors alleging direct claims that had improperly been found as derivative in the court below. Although Hansen does not pursue a class action, he does affirmatively argue that the duty at issue here is not personal to him, but rather applicable to all investors who invested because of the specific misrepresentations at issue.  Accordingly, Sweeney's duty to disclose to Hansen based on superior knowledge is not preempted by federal securities laws.

> ii. *Hansen adequately alleges Sweeney's duty to correct Kelly's misrepresentations in relation only to the 2007 document claiming a revenue-generating contract.*

Notwithstanding Sweeney's duty to correct Kelly's misrepresentations, Hansen can allege that duty only as to those statements that Sweeney knew Kelly made. But Hansen's complaint is devoid of any allegation that Sweeney knew of any specific statement Kelly made to Hansen prior to Sweeney's appointment as Wwebnet's CFO in December 2006. Accordingly, he fails to state a claim that Sweeney had a duty in relation to those statements.

As for statements made after Sweeney joined Wwebnet, Hansen alleges Kelly's

misrepresentations in four contexts: certain weekly conversations during Sweeney's tenure as CEO in which Kelly misrepresented Wwebnet's revenue-generating contracts, external software development contracts, and his own executive compensation, SAC ¶¶ 51, 89; the two August 2007 documents containing representations about software development and ownership, id. ¶¶ 35, 53(e); and the 2007 document titled "Wwebnet, Inc. Content Acquisition Model," id. ¶ 53(f), which listed the Universal Music contract as existing with a minimum revenue guarantee of $3,000,000. All four statements are alleged to have been made jointly by Sweeney and Kelly.

The allegations in relation to the first group of statements fail entirely to satisfy Rule 9(b) particularity. Unlike Hansen's allegation of a specific question-and-answer conversation with Sweeney, Hansen only generally alleges that from 2005 to 2008 Kelly consistently stated that Wwebnet was generating money from contracts and that Kelly and Sweeney provided Hansen with information regarding the company, its software development, and Kelly's executive compensation. By failing to provide any particular statement at any particular time, Hansen fails to comply with Rule 9(b).

The second and third statements are not misrepresentations, as explained above. But the fourth statement is a different story. Because Hansen alleges that Sweeney and Kelly jointly provided the document to him, Sweeney may be liable both for any misrepresentation therein and for failing to correct Kelly's misrepresentation therein. As the Court has already decided above that the allegations about this statement do particularly plead Sweeney's fraud, Hansen also successfully pleads Sweeney's fraud by omission.

In sum, the Court concludes that Hansen adequately alleges fraud by omission in relation to the 2007 document with the Universal Music contract claim.

## IV.   CONCLUSION

For the reasons described above, Defendant's motion to dismiss the Second Amended Complaint is **GRANTED IN PART and DENIED IN PART**. (ECF No. [X].) Defendant's motion to dismiss the causes of fraudulent inducement by misrepresentation or omission of investments (f) through (m), based on statements made in the August 2007 Universal Music contract document and in conversations about the Universal music contract occurring shortly after June 2007, is **DENIED WITHOUT PREJUDICE**. All other claims are **DISMISSED**. The Court also schedules a status conference for **August 10, 2015 at 3 :30 p.m.** Counsel for the parties should report to Courtroom 1306 at the Thurgood Marshall U.S. Courthouse, 40 Foley Square, New York, NY 10007.

**SO ORDERED.**

Dated:  July 31 , 2015
        New York, New York

_____
ANDREW L. CARTER, JR.
**United States District Judge**